**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**AT LEXINGTON**

**CIVIL ACTION NO. 13-5-DLB-REW**

**JULIAN SHULMAN**                                                                 **PLAINTIFF**

**vs.**                        **MEMORANDUM OPINION AND ORDER**

**AMAZON.COM.KYDC, LLC, et al.**                                          **DEFENDANTS**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## I.    Introduction

Defendants Amazon.com.kydc, LLC and Amazon.com, Inc. (collectively, "the Amazon Defendants") move for summary judgment on *pro se* Plaintiff Julian Shulman's ("Shulman") claim for violations of the Americans with Disabilities Act ("ADA") and Kentucky Civil Rights Act ("KCRA"). The Amazon Defendants argue that Shulman failed to establish a prima facie case of disability discrimination because his osteoarthritis does not constitute a disability within the meaning of the ADA Amendments Act of 2008 ("ADAAA"). Alternatively, the Amazon Defendants contend that Shulman's claim fails the *McDonnell Douglas* burden shifting test because he cannot prove that his performance-based termination was a pretext for discrimination. The Amazon Defendants then argue that summary judgment is appropriate on Shulman's breach of implied-in-fact contract and class action claims because the record is devoid of supporting evidence. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

1

## II.    Factual and Procedural Background

On February 8, 2008, Amazon.com.kydc, LLC ("Amazon Ky.") offered Shulman employment as a Warehouse Associate at their "LEX1" fulfillment center in Lexington, Kentucky. (Doc. # 72-2). The offer letter stated that Shulman would be an employee-at-will, so he or Amazon Ky. could "terminate [the] relationship at any time for any reason, with or without cause." (*Id.*). The letter set forth the terms of employment, which superseded any previous discussions or offers of employment. (*Id.*). Any additions to or modifications of these terms had to be in writing and signed by both Shulman and an Amazon Ky. officer. (*Id.*). Shulman "accept[ed] employment with Amazon.com under the terms set forth in th[e] letter" on February 11, 2008. (*Id.*).

Warehouse Associates are responsible for receiving and relocating products, picking customer orders "on all levels of a multi-level mezzanine," and packing and shipping customer orders. (Doc. # 72-3). The physical demands of the position include standing, walking, lifting up to sixty pounds, bending, reaching, kneeling and crouching for eight to twelve hour shifts, with or without reasonable accommodation. (*Id.*). Shulman signed a Job Description setting forth these requirements, thus certifying that he understood the demands of the position and would be "able to meet, with or without accommodation, the expectations for employment." (Doc. # 72-3). Although he had the opportunity to ask questions about the position before signing, he does not remember doing so. (Docs. # 72-3; 72-21 at 7-8). He also acknowledged receipt of the Employee Handbook, which encouraged him to report workplace discrimination, retaliation and harassment. (Doc. # 72-5).

Amazon Ky. expects their Warehouse Associates, commonly referred to as "pickers," to meet certain productivity standards. (Docs. # 72-7 at 3-4; 72-8 at 3, 7). These standards, which represent the expected number of units picked per hour, are calibrated by analyzing average picker performance. (*Id.*). All pickers must perform at 100% of the productivity standards. (*Id.*). Area Managers review picker productivity weekly, rather than daily or hourly, thus allowing pickers some flexibility in meeting the productivity standards. (Doc. # 72-7 at 3-4).

If a picker fails to "make rate," their Area Manager will notify Human Resources ("HR"). (*Id.*). An HR representative reviews the picker's history of performance counseling and determines what kind of action is appropriate under the "progressive discipline" system. (Docs. # 72-6; 72-7 at 5). The representative then completes the necessary paperwork and relays the decision to the Area Managers, who discuss their performance concerns with the picker. (*Id.*).

Amazon Ky.'s "progressive discipline" system imposes escalating consequences on pickers for persistent failure to meet productivity standards. (Docs. # 72-6; 72-7 at 5). A struggling picker first receives coaching from a top performer. (*Id.*). Coaching remains active for thirty days, then "rolls off" of the picker's record if there are no further mistakes. (*Id.*). If the picker commits another mistake in that thirty day period, he or she will receive a documented verbal warning, active for another thirty days. (*Id.*). First written warnings (active for thirty days), second written warnings (active for sixty days) and final written warnings (active for ninety days) may follow. (*Id.*). If a picker receives a second final written warning or a total of six documented performance warnings (i.e. a first, second or final written warning) within a rolling twelve month period, Amazon Ky. will terminate his or

her employment.[1]  (Doc. # 72-6).

The record reveals that Shulman struggled to meet productivity standards.  After only a month of employment, he received a first written warning.  (Doc. # 72-9 at 1-2).  This warning rolled off his record, but by October 2008 he earned a documented verbal warning. (*Id.* at 3-4).  Amazon Ky. issued two more documented verbal warnings in December 2009 and April 2010, followed by a first written warning in May 2010.  (*Id.* at 7-9).  Shulman received as many as four coaches in the following five months.[2]  (Doc. # 72-8).

Shulman's performance declined noticeably in early 2011.  He received a first written warning on January 24, 2011.  (*Id.* at 13-14).  Amazon Ky. issued a second written warning just six days later.  (*Id.* at 11-12).  According to this warning,  Shulman had failed to meet performance expectations for the six week period from December 19, 2010 to January 23, 2011 and consistently performed in the bottom 25% of all employees in his department. (*Id.*).  Around this same time period, Shulman informed HR representative Vince Woodard that he was experiencing foot and ankle pain.  (Doc. # 72-21 at 14).  Woodard urged him to consult a doctor.  (*Id.*).  Shulman again failed to meet productivity expectations in early February, prompting Amazon Ky. to issue him a final written warning.  (Doc. # 72-9 at 19).

---

1) Additionally, "[i]f an associate is not performing in a collaborative manner and it is limiting (repeated or excessive failures to meet minimum expectations) their success in a number of areas, (including quality), then an associate's entire performance may be evaluated to determine overall level of corrective action up to and including termination, at the discretion of Amazon.com."  (Doc. # 72-6).

2) Although the Amazon Defendants provided a snapshot of Shulman's performance issues, the record itself suggests that they overlooked a few disciplinary actions.  (Doc. # 72-1 at 11).  While the Court sees evidence of four coaches between June 2010 and November 2010, the Amazon Defendants only note two.  (Docs. # 72-1 at 11; 72-8 at 1).  The record also suggests that Shulman received a second written warning on May 16, 2010, but again, the Amazon Defendants make no mention of it.  (*Id.*).  Despite these discrepancies, the overall point is clear–Shulman underwent a significant amount of performance counseling during his employment at LEX1.

On March 1, 2011, Shulman sought treatment at Lexington Podiatry. (Doc. # 72-at 5). He told Dr. Nicole Freels ("Dr. Freels") that he had been experiencing foot and ankle pain for about three years. (*Id.*). He reportedly tried over-the-counter insoles and powersteps, but they provided only temporary relief. (*Id.*). Dr. Freels ordered custom inserts for Shulman, gave him a wraptor ankle brace and night splint to wear and prescribed a non-steroidal anti-inflammatory drug called Mobic. (*Id.*). She also instructed Shulman on daily stretching exercises and referred him to Advantage Physical Therapy. (*Id.*).

When an employee asks for an accommodation, Amazon Ky. requests medical documentation. (Doc. # 72-10 at 2). Specifically, they give the employee a Request for Medical Information ("RMI") form for his or her physician to complete. (*Id.*). The physician should identify the employee's physical restrictions, the expected duration of these restrictions and whether the condition substantially limits the employee's ability to perform major life activities. (*Id.*; Doc. # 72-11). Dr. Freels completed such a form for Shulman, reporting that he had a 50% restriction on standing, walking or climbing stairs. (Doc. # 72-11). Although she did not state how long she expected these restrictions to last, she indicated that his osteoarthritis did not substantially limit his ability to perform major life activities. (*Id.*).

On March 11, 2011, Shulman had his initial consultation at Advantage Physical Therapy. (Doc. # 72-22 at 11-13). He indicated that his pain was a 4 out of 10 at the worst and that work "severely exacerbate[d] his symptoms." (*Id.*). Advantage staff formulated a care plan for Shulman that included physical therapy sessions twice a week for four weeks, as well as a home exercise plan ("HEP"). (*Id.*). Staff aimed to see "a 50%

improvement in his tolerance of weight bearing activities" and pain "decreased to a 2/10 at worst" at the end of six weeks.  (*Id.*).

Meanwhile, Shulman's site safety team, composed of Area Manager Jason Thomas ("Thomas"), Operations Manager Shelia Durham ("Durham") and various HR personnel, reviewed his RMI and discussed whether they could accommodate his condition by putting him in another position. (Docs. # 72-10; 72-12).  Shulman allegedly asked Thomas to place him in "rebin," but Durham felt that rebin may not be an appropriate accommodation because it required standing 100% of the time.  (*Id.*).  The site safety team ultimately determined that they could not accommodate Shulman's limitations, so Amazon Ky. approved him for a one month leave of absence beginning on March 24, 2011.  (Doc. # 72-13 at 1).  They instructed Shulman to submit an updated RMI no later than April 21, 2011 in order to request an extension of his leave or to return to work.  (*Id.*).

On April 11, 2011, Shulman asked Amazon Ky. to "extend [his] FMLA leave to the full 12 weeks" because his "condition ha[d] not yet substantially improved." (*Id.* at 2). Amazon Ky. was "unable to extend medical leave based on [Shulman's] personal diagnosis of [his] condition," but would consider his request if accompanied by updated medical documentation.  (*Id.* at 3).  It again asked Shulman to submit an updated RMI on or before April 21, 2011.  (*Id.*).

Shulman had a follow-up appointment with Dr. Freels on April 27, 2011.  (Doc. # 72-22 at 7).  Shulman informed her that he had been wearing his wraptor braces and custom orthotics, which seemed to help quite a bit, but he had not been wearing his night splint or

doing his HEP.[3]  (*Id.*).  He had not been to physical therapy since his initial consultation.  (*Id.*).  Shulman indicated that he was able to work for five hours without pain, but then began experiencing discomfort.  (*Id.*).  Dr. Freels completed another RMI form, stating that Shulman had a permanent restriction of walking at 75% capacity and should be limited to five hour shifts.  (Doc. # 72-15).  When asked whether Shulman's condition substantially limited his ability to perform major life activities, Dr. Freels responded by checking exactly between the "Yes" and "No" boxes.  (*Id.*).

Once Shulman provided the updated RMI, Amazon Ky. approved him for a reduced work schedule.  After further prompting from Amazon Ky., Shulman finally provided the updated RMI.  (Docs. # 72-13; 72-15; 72-16).  He would be permitted to work five hour shifts from May 20, 2011 to July 13, 2011, at which point he would have exhausted his 480 hours FMLA time for the year.  (*Id.*).  Amazon Ky. stated that it would re-evaluate Shulman's situation at that time.  (*Id.*).

After resuming work, Shulman asked Amy Derheim, a member of the Leave of Absence and Accommodations Team, to accommodate his disability by allowing him to work a full ten hour shift but take a ten minute break every hour.  (Doc. # 72-21 at 16-17).  She told him that Amazon Ky. would be willing to consider the proposed accommodation if he provided supporting medical documentation.  (*Id.*).  Shulman never provided the requested documents to Amazon Ky., although he insists that he was in the process of obtaining the updated RMI at the time of his termination.  (*Id.*; Doc. # 91-2, p. 3, ¶ 12).

---

3) At his deposition, Shulman admitted that he stopped taking his anti-inflammatory medication because he didn't notice any improvement in his condition.  (Doc. # 72-21 at 11).

Shulman attended two physical therapy sessions in June. (Docs. # 72-22 at 7, 14-15; 87-1 at 1-2). Although Shulman insists that he "went to physical therapy once or twice a week every week I worked at LEX1 after it was prescribed for me," medical records indicate that these were Shulman's first sessions since his initial evaluation. (Docs. # 91-2, p.3, ¶ 19; 72-22 at 7, 11-15). Regardless, Shulman told Advantage staff that his symptoms were improving, even though he had not been performing his HEP. (*Id.* at 14). Shulman did not experience any significant ankle pain between sessions. (*Id.* at 15). However, he had been off of work, which usually resulted in an improvement in his symptoms. (*Id.*).

There is some dispute as to whether Shulman's final written warning from February 14, 2011 rolled off his record shortly after his return. Amazon Ky. maintains that the warning was still active, as Shulman's fifty six days of leave could not be counted towards the ninety day expiration date. (Doc. # 72-1 at 10-11). Shulman insists that those fifty six days did count, and thus, the warning expired on May 14, 2011. (Doc. # 87 at 20). After returning to work, Shulman received coaching twice. (Docs. # 72-9 at 20; 72-8 at 11). Although Amazon Ky. explains that it simply wanted to give Shulman time to readjust to the workplace, he believes that he received coaching because his final written warning had expired. (Doc. # 72-1 at 10-11; Doc. # 87 at 20).

After Shulman failed to meet productivity standards for the week of June 19, 2011 to June 26, 2011, Thomas notified HR representatives and a Termination Request was prepared. (Doc. # 72-17). On July 13, 2011, the expiration date for Shulman's FMLA leave, Amazon Ky. terminated his employment. (Doc. # 72-17). The termination letter offered the following explanation for this decision:

> This termination is a result of not meeting productivity expectations. From 2011-06-19 - 2011-06-26 you processed 2976 units over 25.00 hours for a rate of 119.0 units per hour or 92% to expectation. Based on the expectations for the process(es) in which you worked, you should have processed 3235 units in 25.00 hours, resulting in your termination.

(*Id.*).

On March 29, 2012, Shulman filed a Notice of Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. # 72-18). The EEOC dismissed the claim, closed the file and notified Shulman of his right to sue on September 12, 2012. (Doc. # 72-19). Shulman then filed this lawsuit against Amazon Ky., its corporate parent company, Amazon.com, Inc. and John Does 1-25 in Fayette Circuit Court. (Doc. # 1-1). The Amazon Defendants promptly removed this case to federal court.[4] (Doc. # 1). Discovery has now closed and the Amazon Defendants' Motion for Summary Judgment is ripe for the Court's review. (Docs. # 72, 87 and 90).[5]

## III.   Analysis

### A.   *Standard of Review*

Summary judgment is appropriate when there is no genuine dispute as to any

---

4) Although Shulman named Liberty Mutual Group, Inc. as a Defendant in this action, he failed to serve he complaint and summons upon Liberty Mutual within 120 days of removal. (Doc. # 1-1). Accordingly, the Court dismissed Liberty Mutual without prejudice pursuant to Federal Rule of Civil Procedure 4(m). (Doc. # 6).

5) In his first response to the Motion for Summary Judgment, Shulman argues that the Amazon Defendants' Motion should be denied as untimely filed pursuant to Federal Rule of Civil Procedure 56(b). (Doc. # 73). The Court's initial Scheduling Order imposed a discovery deadline on April 10, 2014 and a dispositive motion deadline on May 15, 2014. (Doc. # 12). The Court later extended the discovery deadline to May 10, 2014 and the dispositive motion deadline to June 15, 2014 (Docs. # 54 and 60). A sanctions issue arose shortly after the close of discovery, prompting the Court to vacate the dispositive motion deadline. (Doc. # 63). Although the Court promised to reset the dispositive motion deadline by subsequent order, if necessary, it failed to do so. Thus, the Court will consider the Amazon Defendants' Motion to be timely submitted.

material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

## B.   Threshold Considerations

### 1.   The Amazon Defendants

Pursuant to the "integrated enterprise" doctrine, "two companies may be considered so interrelated that they constitute a single employer subject to liability under the ADEA and/or the ADA."  *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 994 (6th Cir. 1997) (citing *Armbruster v. Quinn*, 711 F.2d 1332, 1337-38 (6th Cir. 1983)).  Courts should consider the following four factors in determining whether to treat two entities as a single employer: (1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control.  *Id.*  Although "[n]one of these factors is conclusive, and all four need not be met in every case," the third factor is a "central

10

concern." *Id.*

Throughout the litigation, the Amazon Defendants insisted that Amazon.com, Inc. is not a proper defendant because Shulman actually worked for Amazon.com, Inc.'s subsidiary, Amazon Ky., which operates the LEX1 fulfillment center. (Docs. # 1; 2; 72-1 at 1, n.2). Nevertheless, Shulman contends that Amazon.com, Inc. "exercised control over operations sufficient to attach liability to it," as evidenced by the fact that the company name on the paychecks changed more than once. (Doc. # 87 at 6-7). He also notes that Amy Derheim could not identify which corporate entity employed her. (*Id.* at 7). Because this anecdotal evidence does not even come close to satisfying the "integrated enterprise" doctrine, the Court will dismiss Amazon.com, Inc. from this action.[6]

### 2.    Shulman's Complaint

"[A]llegations of a complaint drafted by a *pro se* litigant are held to less stringent standards than formal pleadings drafted by lawyers in the sense that a *pro se* complaint will be liberally construed in determining whether it fails to state a claim upon which relief could be granted." *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991) (noting that "*pro se* litigants should not be precluded from resorting to the courts merely for want of sophistication"). However, courts have been unwilling to completely "abrogate basic pleading essentials in *pro se* suits." *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989) (collecting cases); *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996) (noting that "the lenient treatment generally accorded to [*pro se*] litigants has limits").

---

6) Although neither party addressed this issue in their briefing, Shulman pled John Does 1-25 as Defendants in this action. Because Shulman failed to identify and serve them within the appropriate time period, the Court will now dismiss them from this action. *See* Fed. R. Civ. P. 4(m) (requiring a plaintiff to serve a defendant within 120 days of filing the complaint).

Shulman's complaint alleges that "Defendant Amazon's termination of [P]laintiff Shulman's employment is in violation of the Americans with Disabilities Act and KRS 344.040(1)(a) and breached an implied contract of continued employment." (*Id.*).  The Court reads this complaint as stating three claims against Amazon Ky.: (1) disability discrimination in violation of the ADA; (2) disability discrimination in violation of the KCRA; and (3) breach of implied-in-fact contract.  (Doc. # 1-1 at 4).  In his response, Shulman confirms that this is an appropriate interpretation of his complaint, but believes that the facts of his case may also support additional claims under the ADA (failure to accommodate, retaliation, conducting prohibited medical inquiries and harassment) and FMLA (retaliation and interference).  (Doc. # 87 at 6, 17).  Because the factual allegations in the complaint allude to proposed accommodations and FMLA leave, Shulman essentially asks the Court to infer the existence of such claims.  (*Id.*).  If the Court is unwilling to do so, Shulman indicates that he will seek leave to amend the complaint in the future.  (*Id.*).

As a *pro se* litigant, Shulman is certainly entitled to some leeway in his pleadings. However, he seeks far more than a liberal construction of his complaint.   Shulman essentially asks the Court to review his complaint after discovery has closed and infer the existence of admittedly un-pled claims.  Because the Court believes that such a maneuver would essentially "abrogate basic pleading essentials in *pro se* suits," it will not allow Shulman to infer the existence of additional ADA and FMLA claims.

While Shulman has not filed a formal Motion for Leave to Amend, the Court must advise him that such a Motion would be untimely.  He failed to amend his complaint in a timely fashion and offers no justification for his failure to do so.  *Accord* Fed. R. Civ. P. 15(a) (stating that leave to amend "shall be freely given when justice so requires"); *Duggins*

*v. Steak 'n Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (finding that there is "an increased burden [ ] on the movant at this late stage in the litigation to show justification for the failure to move earlier").  Given the advanced stage of the litigation, granting Shulman leave to amend would also create a risk of prejudice to Amazon Ky.  *See Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 459 (6th Cir. 2001) (affirming the district court's denial of a motion to amend because discovery had closed and dispositive motions were pending); *Duggins*, 195 F.3d at 834 (denying amendment of complaint because "defendant would suffer significant prejudice in having to reopen discovery and prepare a defense for a [different] claim").  For these reasons, the Court will not entertain future attempts to amend the complaint.

### 3.    Motion to Supplement Response

The Court must address one more threshold issue before addressing the merits of the Amazon Defendants' motion.  Shortly after Amazon Ky.'s Motion for Summary Judgment (Doc. # 72) became ripe for review, Shulman filed a Motion to Supplement his Response (Doc. # 91), to which he attached ten exhibits.  Most of these exhibits are either identical to those already attached to Shulman's response or slightly amended; a few are new.  Amazon Ky. moved to strike all of these exhibits from the record (Doc. # 95), arguing that Shulman should not be given yet another opportunity to respond to their Motion.[7]   It also raises specific objections as to Exhibits 1, 2, 3 and 4.   The Court may exercise its discretion in resolving this issue pursuant to Federal Rule of Civil Procedure 56(e).

---

7) The Court granted Shulman two extensions of time to respond to the Motion for Summary Judgment.  (Docs. # 75, 85).

Although Shulman certainly has had ample opportunity to compose his response, Amazon Ky.'s timeliness concerns are overstated because most of the exhibits are not new. They have simply been edited and reorganized into a more accessible format, which is helpful to the Court in processing these Motions.

Amazon Ky. argues that Exhibit 1 (Declaration by Julian Shulman) should be stricken from the record because it is confusing. While Shulman's original Declaration listed his age as 42 and included a handwritten date of execution, Exhibit 1 indicates that Shulman is 43 years old and bears a typewritten date of execution. (Docs. # 87-2; 91-2 at 2-4). While Amazon Ky. is quick to point out these discrepancies, it fails to explain why these corrections are unduly confusing to the Court. Because these changes have no bearing on the substantive issues in this case, the Court will allow Exhibit 1 to supersede Shulman's original declaration.

Amazon Ky. lodges a similar complaint as to Exhibit 4 (Excerpt from Deposition of Operations Manager Shelia Durham). Shulman attached an excerpt to his response, but now offers a smaller selection of pages. (Docs. # 87-4; 91-2 at 8-14 and 15-33). Amazon Ky. argues that it is unclear which excerpt Shulman wishes the Court to consider. Because all of the pages in Exhibit 4 were included in the original attachment, while some of the pages from the original attachment were omitted from Exhibit 4, it is clear to the Court that Shulman intends Exhibit 4 to supersede his initial deposition excerpt.

Amazon Ky. objects to Exhibit 2 (Performance Review Notes) because it is a "new document." (Doc. # 95 at 2). These notes discuss Shulman's performance at LEX1, so they were likely produced by Amazon Ky. during discovery. Thus, they are not "new" in the sense that they were not disclosed to Amazon Ky. Their objection seems to be based on

the fact that this document was not attached to Shulman's response.  This is incorrect. Shulman attached a copy of these notes to his initial response, rendering Exhibit 2 harmlessly duplicative.  (Doc. # 87-3 at 2).

Finally, Amazon Ky. contends that Exhibit 3 (Integrity Staffing's Advertisement for Warehouse Associate Position) should be excluded because it was never disclosed in discovery.  (Doc. # 91-2 at 7, 14).  Because the posting is dated August 24, 2011, Amazon Ky. argues that Shulman must have been aware of the posting prior to the discovery deadline, and yet he never provided a copy to Amazon Ky.  Here, the Court must agree. The Court has repeatedly warned Shulman that he would be precluded from using any undisclosed documents to support his claim. (Doc. # 69).  Accordingly, Amazon Ky.'s Motion to Strike is granted *only* as to proposed Exhibit 3, while Shulman's Motion to Supplement the Record is granted *except* as to proposed Exhibit 3.  The Court will not entertain any further attempts to supplement the record, as Amazon Ky.'s Motion for Summary Judgment is ripe for review.

### C.    Disability Discrimination Claim[8]

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions,

---

8) Shulman's Complaint states a claim for violations of the Americans with Disabilities Act and the Kentucky Civil Rights Act.  Because the Americans with Disabilities Act provides the same protections as the Kentucky Civil Rights Act, the Court will use the federal framework to analyze both claims.  *Compare* 42 U.S.C. § 12112 *with* Ky. Rev. Stat. Ann. § 344.010, et seq.; *see Bryson v. Regis Corp.*, 498 F.3d 561, 754 (6th Cir. 2007); *Hallahan v. Courier-Journal,* 138 S.W.3d 699, 706-07 (Ky. Ct. App. 2004).

and privileges of employment." 42 U.S.C. § 12112(a). Because direct evidence[9] of discriminatory treatment is usually unavailable, the law allows plaintiffs to present indirect evidence of discrimination using the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green.* *See* 411 U.S. 792, (1973); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). The plaintiff must first state a prima facie case of disability discrimination. *Id.* If the plaintiff makes the requisite showing, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse action. *Id.* The burden then shifts back to the plaintiff to show that the proffered reason is a pretext for discrimination. *Id.* The parties agree that *McDonnell Douglas* is the appropriate test for Shulman's claim. (Docs. # 72-1 at 14; 87 at 1).

### 1.    Prima facie case

A prima facie case of disability discrimination in violation of the ADA consists of the following five elements: (1) the plaintiff is disabled; (2) the plaintiff is otherwise qualified to perform the essential functions of the position, with or without reasonable accommodation; (3) the plaintiff suffered an adverse employment action because of his or her disability; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.[10] *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). Amazon Ky. attacks

---

9) Direct evidence allows the fact finder to conclude that the employer's actions were motivated by unlawful discrimination without drawing any inferences. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998); *Burress v. City of Franklin, Tenn.*, 809 F. Supp. 2d 795 (M.D. Tenn. 2011). Examples include a facially discriminatory employment policy or an employer's statement of intent to terminate an employee based on a qualified disability. *Id.*

10) As *Whitfield* acknowledged, "[t]here has been some confusion in this circuit as to the proper test for establishing a *prima facie* case of employment discrimination under the ADA." *See* 639 F.3d at 258. The Sixth Circuit previously held that only three elements were necessary to state a *prima*

only one aspect of Shulman's prima facie case–whether or not he is disabled.

The ADA Amendments Act of 2008 ("ADAAA")[11] construes "the definition of 'disability' . . . broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.1(c)(4). Accordingly, an individual is "disabled" if they satisfy one of the following criteria:

> (A)   a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B)   a record of such an impairment; or
>
> ©   being regarded as having such an impairment as described in paragraph (I) of this section.

29 C.F.R. § 1630.2(g)(1); *see also* 29 C.F.R. § 1630.2(g)(2) (stating that "[a]n individual may establish coverage under any one or more of these three prongs of the definition of disability"). "The question of whether an individual meets the definition of disability under this part should not demand extensive analysis." 29 C.F.R. § 1630.1(c)(4).

---

*facie* case: (1) the plaintiff is an individual with a disability; (2) the individual was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) the plaintiff was discharged solely by reason of the disability. *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002). A handful of other cases have stated that the *prima facie* case is composed of four elements: (1) the plaintiff was 'disabled' within the meaning of the Act; (2) the plaintiff was qualified for the position, with or without an accommodation; (3) the plaintiff suffered an adverse employment decision with regard to the position in question; and (4) a non-disabled person replaced the plaintiff or was selected for the position that the disabled person had sought. *See, e.g., Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 882 (6th Cir. 1996). In *Whitfield*, the Sixth Circuit makes it clear that a prima facie case of disability discrimination consists of five elements, which are set forth in the body of this Court's opinion. *See* 639 F.3d at 259.

11) The ADAAA's primary purpose is "to make it easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4).

Shulman attempts to establish coverage under the first prong, often referred to as the "actual disability" prong. Under this prong, "[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630(j)(1)(ii) (further noting that "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting"). Major life activities include "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(I). Although the term 'substantially limits' should be "construed broadly in favor of expansive coverage," "not every impairment will constitute a disability within the meaning of this section." 29 C.F.R. § 1630.2(j)(1)(i)–(ii).

Amazon Ky. argues that Shulman is not disabled within the meaning of the ADAAA because his osteoarthritis does not substantially limit his major life activities. In support of this assertion, Amazon Ky. points out that Shulman reportedly experienced symptoms for three years before seeking treatment, then disregarded several of Dr. Freels' orders. He also rated his pain at a 4 out of 10 at the worst.

Shulman maintains that Amazon Ky. understates the severity of his condition, as evidenced by his medical records.[12] In the second RMI, Dr. Freels stated that Shulman had

---

12) Shulman also refers to an RMI completed by his father and an anticipated declaration from Dr. Freels. He admits that his father's RMI "may lead to an unnecessary evidentiary dispute so [he] ha[s] not submitted it at this time." (Doc. # 87 at 2). He has not yet received Dr. Freels' declaration, but believes that it "may clarify what she intended to indicate on that form." (*Id.*). Because neither of these documents were provided to Amazon Ky. before the close of discovery, the Court will not consider their purported contents.

a permanent restriction of walking at 75% capacity. (Doc. # 72-15). She also indicated that Shulman should only work five hours shifts, with any remaining time spent on desk duty. (Doc. # 72-15). Treatment notes from Dr. Freels and Advantage Physical Therapy repeatedly state that Shulman's symptoms ebbed and flowed in relation to the amount of time spent on his feet. (Doc. # 72-22 at 7, 11–15).

Based on the record, Shulman's prima facie case is admittedly a close call. Perhaps this is why Dr. Freels checked exactly between the "Yes" and "No" boxes when asked whether Shulman's condition substantially limited his ability to perform major life activities. On the one hand, Shulman continued to work, reported low levels of pain and selectively complied with his doctor's orders. On the other hand, Shulman could only walk at 75% capacity and work reduced shifts. He also often reported that working exacerbated his symptoms. On this record, the Court is not prepared to definitively hold that Shulman's osteoarthritis constitutes a disability. However, given the ADAAA's expansive coverage, the Court will err on the side of caution and proceed with its analysis on the assumption that Shulman's osteoarthritis does substantially limit his major life activities.[13] Thus, the Court must also presume that Shulman has successfully stated a prima facie case of disability discrimination. The burden now shifts back to Amazon Ky. to articulate a legitimate non-discriminatory reason for his termination. *Whitfield*, 639 F.3d at 259.

### 2. Legitimate non-discriminatory reason

Poor job performance constitutes a legitimate non-discriminatory reason for adverse

---

13) Even if the Court is too generous in assuming that Shulman is disabled, any errors in this analysis will have no impact on the ultimate disposition of Amazon Ky.'s Motion. As explained below, Amazon Ky. is entitled to summary judgment on Shulman's disability discrimination claim because he cannot demonstrate pretext.

action.  *Whitfield*, 639 F.3d at 261-62; *see also Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008) ("Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment and, by articulating such a reason, [the defendant] met its initial burden under the *McDonnell Douglas/Burdine* framework.").

Amazon Ky. maintains that it terminated Shulman's employment "because he failed to meet performance criteria, despite numerous chances to improve."  (Doc. # 72-1).  This is consistent with the termination letter sent to Shulman, stating that "[t]his termination is a result of not meeting productivity expectations."  (Doc. # 72-17).  Amazon Ky. further supports its position with records of Shulman's productivity coaching sessions, verbal warnings and written warnings.  (Docs. # 72-8; 72-9).  Because Amazon Ky. has articulated a legitimate, non-discriminatory reason for terminating Shulman's employment, the burden now shifts back to Shulman to demonstrate that Amazon Ky.'s proffered reason for termination is a pretext for discrimination.

### 3.    Pretext

A plaintiff may show pretext by demonstrating one of the following: (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate the employer's action; or (3) they were insufficient to motivate the employer's action.  *Wright v. Memphis Light, Gas & Water Div.*, 558 F. App'x 548, 554 (6th Cir. 2014).  The plaintiff must "produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it [took adverse employment action.]" *Id.* (*quoting Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).  "[T]emporal proximity alone cannot create a genuine issue of material fact as to whether Defendant's proffered reason for termination was pretext, and that the actual motivation was disability discrimination."

*Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 798 (6th Cir. 2006).

Shulman tries to prove that his termination for poor performance is a pretext for discrimination using two of the above-referenced methods.  (Doc. # 87 at 4-5).  First, he suggests that the proffered reason for his termination has no basis in fact because his job performance was not poor.  He then argues that the proffered reasons did not actually motivate Amazon Ky.'s action, as evidenced by its behavior around the time of his termination.  (*Id.*).  In support of this proposition, Shulman points to the following instances of pretextual behavior: (1) Amazon Ky.'s failure to follow normal termination procedures; (2) its decision to terminate his employment even though his final written warning had expired; (3) its destruction and/or fabrication of documents; and (4) its decision to terminate his employment just one and a half months after he requested an at-work accommodation.  (*Id.*).

Shulman's "poor performance" argument lacks merit.  He points to one "inconsistency" in the record, cites to a non-existent selection of pages[14] and concludes by

---

14) Specifically, Shulman directs the Court to consider the inconsistency between Amazon Ky.'s Motion and Shelia Durham's Deposition.  Amazon Ky. explains that "[t]he standard itself is calibrated regularly based on Amazon's analysis of performance data that reflects average picker performance."  (Doc. # 72-1 at 5).  When asked about the process for calculating productivity standards, Durham offered the following explanation:

> So we do a – a yearly rate analysis.  So it's based on a yearly rate analysis beginning of the year every year we look at rates and we make that adjustment.  Did we do any process improvements to increase did we do any – anything different to decrease uh we take that analysis and – and – and it's a it's from here from A to Z and we look at the rates across the boards of all the shifts.  And that's how the rates are determined.  What's the average base rate on everything?  And we go to the seventy fifth (75th) percentile for that rate.

(Doc. # 87-4 at 41).  This is not really an inconsistency, but rather two ways of stating the same overall point.  Shulman also cites to Defendant's Exhibit 4 (Excerpt from Shulman's Deposition), pages 19-25 and 35.  Shulman cannot be referring to the actual pages of the PDF, as it is only 17

stating that he "does not have time to brief this issue extensively at this point."  (*Id.*).

However, his brief references to "average picker performance" and "expectations" lead the

Court to believe that Shulman disagrees with Amazon Ky.'s methods for calculating the

productivity standards. At his deposition, Shulman admitted that his numbers were

consistently below the productivity rate and that "the numbers are most likely very close to

a hundred percent right."  (Doc. # 72-21 at 12).  However, Shulman insisted that "they put

you in a catch-22," stating that "[t]he catch-22 is to place quality, as you are told to do,

above productivity, your productivity will suffer."  (*Id.*).  When asked why Amazon Ky. could

not expect an employee to meet both quality and productivity standards, Shulman stated

that "if we look at the data from the people that I was working with, you'll find that their

expectation's [sic] are rarely met."  (*Id.*).

Although Shulman had some positive notes in his file, the record reflects that he

struggled to meet the productivity standards throughout the course of his employment.

(Docs. # 90-1; 91-2).   In approximately three years, Shulman received performance

counseling at least fourteen times.  (Docs. # 72-8; 72-9).  His second written warning even

stated that his "overall performance is consistently in the bottom 25% of overall performers

in your department."  (Doc. # 72-9 at 11).   Rather than disputing the accuracy of these

figures, Shulman insists that Amazon Ky.'s standard is flawed.  While he is certainly free

to disagree with Amazon Ky.'s policy, he is not excused from complying with it, just as all

Warehouse Associates are expected to do.   Thus, Amazon Ky.'s proffered reason for

termination does have a basis in fact.

---

pages long, but those deposition pages are not included in the excerpt.  Thus, it is unclear what
evidence Shulman wants the Court to consider.

Shulman next argues that Amazon Ky. failed to follow its normal termination policy, but he does not specify how Amazon Ky. deviated from its normal policy or which aspect of the policy it neglected on this occasion. He simply states that "[i]t's pre-termination investigation consists of at most one email." (Doc. # 87 at 5). Later in his response, he notes that his "performance during the week mentioned in the termination letter, June 19-26, 2011 did not garner any notice at Amazon until . . . it was used on July 14 or 13 as a or the basis for [his] termination." (Doc. # 87 at 11).

These factual assertions are supported by the record. However, there is simply no evidence to suggest that these actions or inactions were contrary to Amazon Ky.'s termination policy. Shulman has not attached any documents detailing the employee termination process at LEX1. He does not point to any testimony from Area Managers or Human Resources representatives stating that Amazon Ky. failed to follow its own termination policies in his case. He can only draw unsupported inferences from neutral facts, which are insufficient to demonstrate that Amazon Ky.'s proffered reason for termination did not actually motivate its decision.

Shulman also questions whether he was terminated in accordance with the "progressive discipline" policy. Amazon Ky. maintains that Shulman's final written warning from February 13, 2011 was still active when he returned to work on May 23, 2011. (Doc. # 72-1 at 10-11). Even though more than ninety days had elapsed, Amazon Ky. explains that Shulman's fifty-six day leave of absence did not count towards the warning's expiration date. (*Id.*). Shulman twice failed to meet productivity standards after returning to work, but Amazon Ky. issued coaches so that he could have "a couple of weeks to reacclimatize to the workplace." (*Id.*; Doc. # 91-2 at 34). Shulman offers a different perspective of these

23

events: "Amazon states that they have a practice of leniency upon return to work . . . and that this is why I received coaching in May.  But is it not possible that I received coaching in May because the final written warning had already expired because as the policy describes, 90 days had passed?"  (Doc. # 87 at 20).

Although there is nothing in the record explicitly stating that leaves of absence are excluded from active warning periods, email correspondence between Shulman's Area Manager and HR personnel lends support to Amazon Ky.'s position.  (Doc. # 91-2 at 34). The Area Manager carefully emphasizes the timing of the final written warning in relation to Shulman's leave of absence and final mistakes, suggesting that the warning remained active after Shulman's return to work.  (*Id.*).  He also notes that the coaches were issued "due to poor performance following his return from LOA," thus tying the decision to coach Shulman to his recent leave of absence.  (*Id.*).  This evidence is certainly not conclusive, but Shulman offers nothing to counter it.  He cannot point to any documents or testimony stating that warnings ran only for ninety days, regardless of time off.  Instead, he asks the Court to find that his own suppositions are sufficient to infer the existence of pretext. This the Court will not do.

Shulman then alleges that Amazon Ky. destroyed and/or fabricated documents during the pendency of this litigation.  In support of this assertion, he notes that some of the productivity coaching and corrective action reports are unsigned, undated and marked with non-sequential bar code numbers.  (Doc. # 87 at 5).  His photograph is also missing from these reports.  (*Id.*).  However, the record reflects that HR representatives created these reports each time an employee failed to meet productivity standards, then gave the Area Managers printed copies for the employee's review and signature.  (Doc. # 72-7 at 4).  The

24

record also indicates that employee photographs are unavailable once their badge has been deactivated. (Doc. # 91-2 at 32). At best, Shulman has simply established that the unsigned documents were *printed* during the pendency of the litigation.

In fact, these same characteristics lead the Court to a less nefarious inference. Because Amazon Ky. also provided several signed copies of Shulman's performance counseling records, the more likely explanation is that it only included the unsigned copies when the originals were unavailable. Absent any evidence that Amazon Ky. actually destroyed the signed copies or created the unsigned copies after Shulman's termination, his argument fails.

Shulman's last pretext argument centers on the temporal proximity between his requests for accommodation and his termination. Amazon Ky. terminated his employment within two months of his request for FMLA leave and about a month and a half after his request for an at-work accommodation. (Docs. # 72-16; 72-17; 91-2 at 34, 36). His termination also occurred on the day that his part-time FMLA leave was calculated to end. (*Id.*). These events occurred close enough in time to constitute some evidence of pretext. However, timing alone cannot support a finding of pretext–it must be accompanied by other evidence. *Joostberns*, 166 F. App'x at 798. Shulman has no other evidence. He has only suppositions, as is clear from his deposition:

> Q:    Well, and so why do you – what are your suspicions or what are your speculations about why you were terminated?
>
> A:    That I was terminated because – oh, goodness – partially for productivity, partially because I was a troublesome patient with a medical condition, troubled –

25

> Q: Well, now, wait. Let's go down that path. What in the world –
>
> A: But they're just suspicions. I think – I think it's premature.
>
> Q: Well, I don't think it's premature. I think when somebody files a lawsuit they need a factual basis to file the lawsuit.

(Doc. # 72-21 at 15). Such unsupported inferences are insufficient to satisfy the *McDonnell Douglas* burden shifting test and create a genuine issue of material fact. Therefore, Amazon Ky. is entitled to summary judgment on Shulman's disability discrimination claim.

### D. Claim for Breach of Implied-in-Fact Contract

An implied-in-fact contract is "not an 'anticipated' contract but rather a true contract that 'requires an actual agreement or meeting of the minds although not expressed.'" *BDT Products, Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 886 (E.D. Ky. 2003) (quoting *Kellum v. Browning's Adm'r*, 21 S.W.2d 459, 466 (Ky. 1929)). The existence of terms and conditions of such a contract are inferred from the circumstances or acts of the parties. *Id.* These "'circumstances must be sufficient to clearly and convincingly manifest or prove a mutual assent of minds to enter into the contract sought to be implied or established.'" *Id.* (internal citations omitted). There must also be "at least some semblance of definiteness as to what services were to be rendered, when they were to begin and how long they were to last, and what was promised in recompense for the services." *Veluzat v. Janes*, 462 S.W.2d 194, 196 (Ky. 1970).

Shulman's claim for breach of implied-in-fact contract seems to be based solely on one conversation he had with his Area Manager, Jason Thomas:

> Q: You didn't have an employment contract with Amazon, did you?
>
> A: We did not enter into a written contract, to the best of my knowledge.

I do believe that since I've been doing some reading that we did have – I can't remember exactly what it's called.  I think one of the terms is an implied – an implied contract that was entered into –

Q:      And what was –

A:      – much later.

Q:      What was the implied contract?

A:      That no adverse employment action would be taken against me prior to being advised of my current disciplinary status or – what do they call it? – disciplinary – I think they do call it disciplinary status.

Q:      And what's the basis for your belief that there was some kind of implied contract to that effect?

A:      To keep it fairly short, statements and – made numerous times, in which I was sometimes a party to, that there was a – a – what do they call it? – a – part of it was a performance improvement plan – progressive discipline policy.

Q:      And that's the basis for your belief that there was an implied contract?

A:      That's part of the basis.  Thank you for prompting me.

Also that Mr. Thomas initiated a discussion in which he told me that I would soon to be specifically told whether I was on final warning or whether all my discipline warnings had expired.

(Doc. # 72-21 at 2-3).

Because Shulman's offer letter clearly stated that any additions or modifications to the terms of his employment had to be in writing and signed by both Shulman and an

27

Amazon Ky. officer, and because no such writing existed in this case, Amazon Ky. contends that there is plainly no mutual assent.[15]   Amazon Ky. further argues that Shulman's testimony only evidences his unilateral understanding that no adverse action would be taken against him until his disciplinary status had been verified.   The Court agrees–there is no evidence to clearly and convincingly prove a mutual assent of minds to enter into the contract sought to be implied.   There being no genuine issue of material fact on this claim, Amazon Ky. is entitled to summary judgment.

### E.    Class Action Claims

Although a "trial court has broad discretion in deciding whether to certify a class,   [ ] that discretion must be exercised within the framework of Rule 23."   *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1078-79 (6th Cir. 1996) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)).   Before certifying a class, the court must ensure that four prerequisites are satisfied–numerosity, commonality, typicality and adequacy of representation. Fed. R. Civ. P. 23(a)(1)–(4).   Pleadings alone are insufficient to certify a class action.   *In re Am. Med. Sys., Inc.*, 75 F.3d at 1078-79.

Courts have declined to establish a minimum number of claimants needed to certify a class action.   *Id.*   However, the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).   The class members' claims must arise from the same event or practice or course of conduct and must involve common questions of law

---

15) Amazon Ky. also argues that Shulman waived his right to pursue this claim by failing to address it in his response to the Motion for Summary Judgment. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").   While the law authorizes the Court to find that Shulman has waived this claim, the Court would prefer to address it on the merits.

and fact.  Fed. R. Civ. P. 23(a)(2)-(3).  Finally, the representative parties must be able to "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Sixth Circuit has held that "non-attorneys proceeding pro se cannot adequately represent a class."  *Ziegler v. State of Michigan*, 90 F. App'x 808, 810 (6th Cir. 2004); *see also Powers v. NWA, Inc.*, No. 05-2468-B/P, 2006 WL 984738, at *2 (W.D. Tenn. Apr. 13, 2006) ("Permitting [a *pro se* plaintiff] to represent a class would violate Fed. R. Civ. P. 11(a) and 28 U.S.C. § 1654 and would represent the unauthorized practice of law by [plaintiff.]").

In this case, Shulman has failed to satisfy any of the prerequisites necessary to certify a class.  He has not specifically identified any other potential class members, making him a class of one.  Without any other class members, commonality and typicality are clearly non-existent.  And finally, Shulman is not an appropriate representative party for potential class claims because he is proceeding *pro se*.  Shulman concedes as much, but suggests that this Court appoint "class counsel" to investigate these allegations further. The Court is not inclined to grant such relief, as it is unaware of any legal precedent to support Shulman's request.  Furthermore, it is not the Court's job to go on a fishing expedition and attempt to resuscitate a dying class action claim brought by a *pro se* plaintiff.  Thus, Amazon Ky. is entitled to summary judgment on Shulman's class action claim.

## IV. Conclusion

Accordingly, for reasons stated herein,

**IT IS ORDERED** as follows:

(1)     The Amazon Defendants' Motion for Summary Judgment (Doc. # 72) be, and

is hereby, **GRANTED IN FULL**; and

(2)     A Judgment shall be entered contemporaneously herewith.

This 20th day of April, 2015.



Signed By:
*David L. Bunning*
United States District Judge

G:\DATA\Opinions\Lexington\13-5 MOO Granting D MSJ.wpd